IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PALMYRA PACIFIC SEAFOODS, L.L.C., a Washington limited liability company; PALMYRA PACIFIC ENTERPRISES, L.L.C., a Washington limited liability company; PPE LIMITED PARTNERSHIP, a Washington limited partnership; KINGMAN REEF ENTERPRISES, L.L.C., a Washington limited liability company; and FRANK SORBA, an individual, | No. 07-35C |
| Plaintiffs, | (Judge Eric G. Bruggink) |
| v. | |
| THE UNITED STATES, | |
| Defendant. | |

DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT, OR IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(6) and 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests this Court to dismiss plaintiffs' first amended complaint for failure to state a claim upon which relief can be granted. Alternatively, to the extent resolution of our motion to dismiss requires the Court to interpret the licenses and sublicenses that are the subject of this action, then, pursuant to RCFC 56, we respectfully request that the Court enter judgment in favor of the United States as a matter of law. See Varilease Technology Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002)(contract interpretation is a question of law generally amenable to summary judgment). In support of

this motion, we rely upon the following brief, the attached exhibits, and the amended complaint.

## DEFENDANT'S BRIEF

## STATEMENT OF THE ISSUES

1. Whether plaintiffs have failed to state a claim that the Government's alleged actions constituted a taking in violation of the Fifth Amendment to the United States Constitution.

2. Alternatively, whether the Government is entitled to judgment as a matter of law.

## STATEMENT OF THE CASE

### I. Nature Of The Case

Plaintiffs Palmyra Pacific Seafoods, L.L.C. ("PPS"), Palmyra Pacific Enterprises, L.L.C. ("PPE"), PPE Limited Partnership ("PPELP"), Kingman Reef Enterprises, L.L.C. ("KRE"), and Frank Sorba ("Sorba") (collectively, "plaintiffs") allege that the United States committed a Fifth Amendment taking of their property interests when it designated Palmyra Atoll ("Palmyra") and all waters within 12 nautical miles a National Wildlife Refuge.[1] Compl. 8-10.[2] Plaintiffs argue that "[t]he

---

[1] An "atoll" is "a ringlike coral island and reef that partially or totally encloses a lagoon." WEBSTER'S II DICTIONARY 135 (1994).

[2] Plaintiffs' First Amended Complaint, filed on April 13, 2007 will be cited as "Compl." followed by the specific page

[G]overnment's actions made it impossible for [p]laintiffs to make any economically viable use of their exclusive license to use Palmyra as the base for a commercial fishing operation, [and] rendered their valuable property rights worthless." Compl. 2. A clear reading of plaintiffs' license, however, shows that plaintiffs have no compensable property interests to be taken or compensated for, and, therefore, the amended complaint must be dismissed for a failure to state a claim upon which relief can be granted, or, in the alternative, judgment should be entered for the United States as a matter of law. See Compl. Ex. A.[3]

## II. Statement Of Facts[4]

### A. The Establishment Of Palmyra And Kingman Reef As National Wildlife Refuges

Palmyra and Kingman Reef are located approximately 33 nautical miles from each other.[5] In 1934, pursuant to statutory authority permitting the President to withdraw and reserve public lands for public purposes, President Franklin D. Roosevelt issued

---

reference.

[3] Defendant denies that the establishment of the national wildlife refuge at Palmyra amounted to a "taking" of any property rights.

[4] For purposes of this motion only, we accept as true the factual allegations as set forth in the amended complaint.

[5] Although plaintiffs do not make any claims regarding Kingman Reef in this case, see Compl. 8-10, it is necessary to discuss Kingman Reef to provide full context to the background facts regarding Palmyra.

an Executive Order that "reserved [and] set aside" Kingman Reef and placed it and other small Pacific islands "under the control and jurisdiction of the Secretary of the Navy." Exec. Order No. 6935 (December 29, 1934) (attached as exhibit A). By its own terms, the Executive Order "shall continue in full force and effect unless and until revoked by the President or by act of Congress." The Executive Order has never been revoked, and remains in place today. In 1941, President Roosevelt issued another Executive Order that established a Naval Defensive Sea Area and Naval Airspace Reservation over "the territorial waters between the extreme high-water marks and the three-mile boundaries" surrounding Palmyra, Kingman Reef, and a number of other Pacific islands. Exec. Order No. 8682 (attached as exhibit B). Pursuant to this Executive Order

> [a]t no time shall any person, other than persons on public vessels of the United States, enter any of the naval defensive sea areas herein set apart and reserved, nor shall any vessel or other craft, other than public vessels of the United States, be navigated into any of said areas, unless authorized by the Secretary of the Navy.

See Ex. B.

Around this time, "the United States established a naval base on Palmyra that included a 6,000-foot runway, a deep-water dock, a small-boat harbor and several semi-permanent structures built on concrete slabs the Navy poured." Compl. 3.

On August 25, 2000, the Navy determined that its control and jurisdiction over Kingman Reef, "together with all reefs surrounding" it, were in excess to national defense requirements, and transferred custody over Kingman Reef to the Department of the Interior pursuant to the Federal Property and Administrative Services Act. See 40 U.S.C. § 524(b) (requiring Federal agencies to transfer and obtain excess property from other Federal agencies); See also Ex. C, attached hereto.

On January 18, 2001, by Secretarial Order, the Secretary of the Interior established the Kingman Reef National Wildlife Refuge pursuant to the National Wildlife Refuge Administration Act. 16 U.S.C. § 668dd(a). The National Wildlife Refuge Administration Act authorizes the Secretary to designate an area as within the refuge system by secretarial order. That same day, Palmyra was designated one of these areas.

The majority of the emergent land at Palmyra was owned by the Fullard-Leo family of Hawaii and their related entities until the family sold it to The Nature Conservancy in late 2000. On January 18, 2001, the Secretary of the Department of the Interior established the Palmyra Atoll National Wildlife Refuge pursuant to the National Wildlife Refuge Administration Act. 16 U.S.C. § 668dd(a); Compl. Ex. G. The refuge consisted of tidal lands, submerged lands, and waters out to 12 nautical miles. Compl. Ex. G. In 2003, The Nature Conservancy conveyed approximately 416

acres of emergent land at Palmyra to the United States for addition into the refuge. See Ex. D, attached hereto. In September 2006, The Nature Conservancy conveyed an additional 28 acres to the United States for addition into the refuge. See Ex. E, attached hereto. The interest The Nature Conservancy conveyed to the United States was subject to the unrecorded license agreement at issue here. See Exs. D, E. The plaintiffs have no valid interest in either the submerged lands or the waters surrounding Palmyra. Pollard's Lessee v. Hagen. 44 U.S. 212, 228-29 (1845); United States v. California, 332 U.S. 19, 34-35, 38 (1947).

B. The License And Sublicense Agreements

Prior to July 1, 1999, the Fullard-Leo family, the owners of the majority of Palmyra at the time, conveyed an exclusive license to establish a commercial fishing operation on Palmyra to Palmyra Development Company, Inc. ("PDC"). Compl. 4. PDC is neither a party to this lawsuit nor an affiliate of the plaintiffs.

On or about July 1, 1999, PDC granted PPE, a plaintiff in this case, a license agreement to use Palmyra "for commercial fishing and related transport and support operations." ("master license" or "license") Compl. Ex. A at 2. Article 7 of the license states:

> Section 7.01. Taking of Property. In case at any time or times during the Term, the

> Property or any part thereof, or any other part of Palmyra which Licensee is permitted to use under this Agreement, shall be required, taken or condemned by any authority having the power of eminent domain, then this Agreement *shall at once cease and terminate*.
>
> All compensation and damages payable for or on account of **all land and improvements shall be payable to and be the sole property of Licensor [i.e., PDC]**, except that Licensor agrees to pay to Licensee out of said compensation and damages an amount [defined in Article 7] . . . .
>
> In addition to the amount set forth above, Licensee shall also be entitled to claim and recover from the condemning authority, but not from Licensor, such compensation as may be separately awarded to or recovered by Licensee in its own right for any buildings, equipment and fixtures on the Property which are owned by Licensee, or the cost of relocation or removal thereof or for any loss or damage thereto, **but not for any damage or loss to Licensee's improvements, business or operations under this Agreement**.

Compl. Ex. A at 33-34 (emphasis added). Therefore, in the event of a taking or condemnation, the plain language of the license limited the compensable rights of the licensee solely to its own buildings, equipment and fixtures, and retained all other compensable rights for to the Licensor. Moreover, the license agreement provided that PPE could not "sell, assign, transfer, license, mortgage, or otherwise encumber all or any portion of its interest in [the] Agreement, without [PDC's] prior written consent, which may be withheld by [PDC] in its sole and absolute discretion." Id. at 35.

Sometime thereafter, PPE formed PPELP for the specific purpose of developing commercial fishing operations at Palmyra. Compl. Ex. C at 5. In May 2000, with the written approval of PDC, PPE sublicensed its rights under its license with PDC to PPELP. Id. PPELP, in turn, formed PPS for the specific purpose of developing commercial fishing operations at Palmyra. Compl. Ex. D at 2. In May 2000, with the written approval of PDC, PPELP sublicensed its rights under its sublicense with PPE to PPS. Id.

On April 13, 2007, plaintiffs PPE, PPELP, PPS, KRE and Sorba filed the amended complaint, alleging a categorical and regulatory taking of their claimed property interests.

## SUMMARY OF ARGUMENT

Plaintiffs allege a categorical and regulatory taking of private property in violation of the Fifth Amendment to the United States Constitution. Compl. 8-10. The Government denies that the establishment of the Palmyra Atoll National Wildlife Refuge resulted in any "taking" of property in violation of the Fifth Amendment. First, courts have held that no property rights are created in permits and licenses. Second, even if plaintiffs' license created any property right (which it did not) and assuming that a Fifth Amendment taking had occurred as alleged by plaintiffs (which it did not), plaintiffs' claims still fail because they can not demonstrate the existence of any compensable property interest that could have been taken in this situation.

Moreover, plaintiff, KRE, is neither a party to any license or sublicense identified in the amended complaint, nor does it assert that it possesses any type of property interest in Palmyra. Indeed, KRE is not even mentioned in the substance of the amended complaint other than in the caption. Accordingly, the amended complaint should be dismissed for failure to state a claim upon which relief can be granted, or, in the alternative, judgment should be entered for the United States as a matter of law.

## ARGUMENT

### I. Legal Standards

A motion to dismiss pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted is appropriate when the plaintiff's alleged facts do not entitle him to a remedy. Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998).

Summary judgment may be granted where there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42 (1989).

A court may consider a motion for summary judgment in stages. The initial inquiry should be whether the movant has

presented an adequate legal basis for its motion. E.g., Ralph Larson, 17 Cl. Ct. at 43. If the legal support is insufficient, then the inquiry is at an end and the motion must be denied. E.g., Anderson, 477 U.S. at 250 ("There is no requirement that the trial judge make findings of fact."). Once a movant has established an adequate legal basis for its motion, the Court must consider whether the opposing party has identified any genuine issues of material fact. The first step is to determine whether the issues raised are truly factual issues, or are issues of law. The second step is to determine what subset of the truly factual issues are material to the decision of the case. The third step is to examine the evidence presented by the parties to determine whether there is any genuine issue concerning any material factual issue. Ralph Larson, 17 Cl. Ct. at 43 (describing three steps); accord Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.").

## II. Plaintiff's Fail To State A Takings Claim Upon Which Relief Can Be Granted

The Fifth Amendment to the Constitution prohibits the Government from taking private property for public use, without just compensation. U.S. CONST. amend. V. The policy behind the Fifth Amendment is to prohibit the "Government from forcing some

people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Penn Central Transp. Co. v. New York City, 438 U.S. 104, 123 (1978). Although most takings occur as a result of a physical invasion or confiscation, the United States Supreme Court has recognized that there may be instances where a regulation goes so far as to be recognized as a taking. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922).

The United States Court of Appeals for the Federal Circuit has developed a two-part test to determine whether a taking has occurred. American Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004). "[A]s a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment. If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end." Id. If the court is able to identify a valid property interest, it must then "determine whether the governmental action at issue amounted to a compensable taking of that property interest." Id. It is only at this second stage of the analysis that the court decides whether the taking is a categorical taking.[6] Id.

[6] The United States Supreme Court has recognized categorical takings in two types of situations. Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015 (1992). The first type encompasses regulations that compel the property owner to suffer a physical "invasion" of his property. Id. The second type

In this case, it is not necessary, at this point, to address the second part of the Federal Circuit's test because plaintiffs' assertions fail to satisfy the first part of the test – that of establishing a compensable property interest. See American Pelagic Fishing, 379 F.3d at 1372.

### A. Plaintiffs' Failure To Demonstrate The Existence Of A Legally Cognizable Property Interest That Could Have Been Taken Is Fatal To Their Takings Claims

"Courts have held that no property rights are created in permits and licenses." Conti v. United States, 291 F.3d 1334, 1340 (Fed. Cir. 2002) (citing United States v. Fuller, 409 U.S. 488, 493 (1973)); see also American Pelagic Fishing, 379 F.3d at 1372. In Conti, the United States Court of Appeals for the Federal Circuit "[applied] traditional notions of property and existing rules and understandings" to conclude that appellants swordfishing permit "[fell] short of conferring a cognizable property interest." Conti, 291 F.3d at 1340. The court ruled that, although appellant used his permit for more than a decade, he could not assign, sell, or otherwise transfer the permit, all of which are "traditional hallmarks of property." Id. at 1341. The Court also found in Conti that the appellant's permit was

---

encompasses regulations which deny all economically beneficial or productive use of land. Id. Therefore, even if this Court were to reach the second step of a taking analysis, plaintiffs' claims of a categorical taking would still fail because the analysis focuses on the economically beneficial or productive use of the land, not license rights relating to the land. Id.

non-exclusive and revocable. Id. Accordingly, the Court held that appellant's swordfishing permit was not a property right but a revocable license, and dismissed his takings claim. Id.

Similarly, in Alves v. United States, 133 F.3d 1454 (Fed. Cir. 1998), the Federal Circuit held that grazing permits did not constitute a property right compensable pursuant to the Fifth Amendment. Rather, the court held that what was compensable was the fee interest only. Id. at 1457.

In this case, plaintiffs allege that their license gives them an "exclusive right to establish a commercial fishing operation on Palmyra." Compl. 1-2. This alleged right is not a property right, but, rather, is a contractual right to do business in certain areas of Palmyra. Moreover, the license did not provide plaintiffs with the traditional hallmarks of property. Plaintiffs could not independently sell, assign or transfer the license. Instead, the licensor had the authority to approve or deny any sale, assignment or transfer of the license without explanation.

Although the license gave plaintiffs some exclusive rights (but not all of the rights in the license were exclusive), that alone is not sufficient to establish a property right where, otherwise, none would exist. Plaintiffs' license does not convey the essential "sticks in the bundle" that would establish a property interest. Conti v. United States, 291 F.3d 1334, 1340

(Fed. Cir. 2002) (citing United States v. Fuller, 409 U.S. 488, 493 (1973)); see also American Pelagic Fishing, 379 F.3d at 1372. Accordingly, their amended complaint fails to state a claim upon which relief can be granted, or, in the alternative, judgment should be entered for the United States, as a matter of law. See American Pelagic Fishing, 379 F.3d at 1372 ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end.")

### B. Plaintiffs' Failure To Demonstrate The Existence Of A Compensable Property Interest Is Fatal To Their Takings Claims

Even if the license created some property right, which it did not, and assuming, for the sake of argument only, that a Fifth Amendment taking had occurred, plaintiffs claims still fail. In their amended complaint, plaintiffs allege that their property interests "included the exclusive right to establish a commercial fishing operation on Palmyra using an airstrip, a deepwater dock, a small-boat harbor, and a base camp on the atoll." Compl. at 2. Plaintiffs also appear to allege a property right to the "improvements to real property, buildings, and facilities located on Palmyra". See Compl. at 6, 7 (emphasis added).[7]

---

[7] Plaintiffs do not and can not claim any exclusive property right to fish in the Exclusive Economic Zone ("EEZ")as the United States holds the sovereign right to manage natural resources in the EEZ, to the extent permitted by international law. Proclamation 5030, 48 Fed. Reg. 10,605 (March 10, 1983).

Plaintiffs claim no ownership interest in Palmyra. Compl. 3. Palmyra was primarily owned by the Fullard-Leo family, then sold to The Nature Conservancy, and, finally, conveyed to the United States. Id. Therefore, any compensable property interest claimed by plaintiffs must be derived from the master license between PDC and PPE because the sublicenses, whose rights flow down from the original license, could not contain any greater property interests, if any, than those granted in the original license. See Klamath Irrigation Dist. v. United States,67 Fed.Cl. 504 (2005)("Simply put, plaintiffs could not obtain an interest from the districts better than what the districts themselves possessed or once possessed-'*nemo dat qui non habet*,' the venerable maxim provides, 'one who does not have cannot give.'"); General Casualty Co. of Am. v. United States, 130 Ct. Cl. 520, 526, 127 F. Supp. 805, 808 (assignor "could not, by assignment, transfer greater rights than he had himself"), cert. denied, 349 U.S. 938 (1955).

It has long been established that contract interpretation begins with the plain language of the agreement. Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). In this case, the plain language of the license agreement is unambiguous and clearly sets forth the set of rights granted to plaintiffs. See Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1353 (Fed. Cir. 2004) (finding that if the contract is

unambiguous, the Court's inquiry is at an end and the plain language of the contract controls).

First, the license specifically provides that if any part of Palmyra "which [plaintiffs are] permitted to use under this Agreement," such as the "exclusive right to establish a commercial fishing operation on Palmyra using an airstrip, a deepwater dock, a small-boat harbor, and a base camp on the atoll" is taken or condemned, then the license "shall at once cease and terminate." Compl. 2, Ex. A at 33. Therefore, assuming a taking took place as plaintiffs allege, the license and all of plaintiffs' claimed compensable expectancy under it ceased and terminated "at once." Id. Accordingly, plaintiffs received no property interests under the license or sublicenses for which plaintiffs could be compensated in the event of a taking. Without possessing a compensable expectancy to be compensated in the event of a taking, plaintiffs' possessed no right to be compensated under the Fifth Amendment. Because the license agreement itself terminated plaintiffs' rights in the event of a taking, they possessed nothing entitling them to compensation for a taking. Those rights would have terminated when the alleged taking occurred, pursuant to the plain, written language of the license agreement.

Second, to the extent plaintiffs claim a property right to the "improvements to real property, buildings, and facilities

located on Palmyra," the rights to be compensated for those improvements would not belong to plaintiffs in the event of a Fifth Amendment taking. Compl. 6, Ex. A at 33-34. The license specifically provides that in the event of a condemnation or taking, "[a]ll compensation and damages payable for or on account of all land and improvements shall be payable to and be the sole property of Licensor," who is not a plaintiff in this lawsuit. Compl. Ex. A at 33-34.

Indeed, the license specifically emphasizes the fact that the property interests alleged by plaintiffs are not compensable. The license provides that plaintiffs "shall [] be entitled to claim and recover from the condemning authority [] such compensation as may be separately awarded to or recovered by [plaintiffs] in [their] own right for any buildings, equipment and fixtures on the Property which are owned by [plaintiffs], or the cost of relocation or removal thereof or for any loss or damage thereto, **but not for any damage or losses to [plaintiffs'] improvements, business or operations under this Agreement**." Compl. Ex. A at 34. Therefore, the license specifically precludes plaintiffs from claiming entitlement to compensation for the property interests alleged in the amended complaint. Rather, under the plain language of the license, any rights to compensation for the alleged taking always remained with the licensor in the event Palmyra was taken or condemned. Id.

The only property interests that would have remained with plaintiffs in an action that might otherwise constitute a taking are its own buildings, equipment and fixtures. Compl. Ex. A at 34. While Plaintiffs acknowledge installing "buildings and improvements," they do not assert ownership of those buildings. Compl. 6. They also do not assert whether the buildings are removable or can be used for other uses. See Conti, 291 F.3d at 1343 (finding that plaintiff's continuing ability "to sell the vessel and the gear, fish in a different fishery, or put both the nets and the vessel to other uses . . . precluded a finding that a regulatory taking had occurred").

Accordingly, even if the license had conveyed any property interest (which it did not) and assuming, for the sake of argument, that a taking had occurred as alleged by plaintiffs, because plaintiffs possess no compensable property interest, plaintiffs' claims should be dismissed for failure to state a claim upon which relief can be granted, or, in the alternative, judgment should be entered for the United States as a matter of law.

**C. Plaintiff KRE Is Not A Party To The License Or Sublicenses Identified In The Amended Complaint, And, Therefore, Its Claims Should Be Dismissed Pursuant to RCFC 12(b)(6)**

In the amended complaint, plaintiff KRE identifies no compensable property interests in Palmyra. Plaintiffs claimed property interests in Palmyra are solely derived from the master

license and its subsequent sublicenses. KRE is a party to none of those agreements, and is only mentioned in the caption of the amended complaint. Accordingly, plaintiff KRE's claims should be dismissed for failure to state a claim upon which relief can be granted pursuant to RCFC 12(b)(6). Id.

## CONCLUSION

For these reasons, the United States respectfully requests this Court to dismiss plaintiffs' amended complaint for failure to state a claim upon which relief can be granted. Alternatively, we respectfully request that the Court enter judgment in favor of the Government as a matter of law.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/Marla T. Conneely
MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C., 20530
Tel: (202) 305-3689
Fax: (202) 305-7643

OF COUNSEL:

Mariel J. Combs
Attorney
U.S. Dept. of Interior
Office of the Solicitor
Pacific Northwest Region
500 N.E. Multnomah St.
Suite 607
Portland, Oregon 97232

July 13, 2007

Attorneys for Defendant