**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

PALMYRA PACIFIC SEAFOODS, L.L.C., a Washington limited liability company; PALMYRA PACIFIC ENTERPRISES, L.L.C., a Washington limited liability company; PPE LIMITED PARTNERSHIP, a Washington limited partnership; KINGMAN REEF ENTERPRISES, L.L.C., a Washington limited liability company; and FRANK SORBA, an individual,

*Plaintiffs*,

v.

THE UNITED STATES,

*Defendant*.

No. 07-35L

Judge Bruggink

**PLAINTIFFS' OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Tel: (202) 942-5000
Fax: (202) 942-5999

*Counsel for Plaintiffs Kingman Reef Enterprises, L.L.C.; Palmyra Pacific Enterprises, L.L.C.; PPE Limited Partnership; Palmyra Pacific Seafoods, L.L.C.; and Frank Sorba*

*Of counsel*:
David B. Bergman
Michael A. Johnson

Dated: August 10, 2007

# TABLE OF CONTENTS

TABLE OF CONTENTS .......... i

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

I. PLAINTIFFS' EXCLUSIVE AND TRANSFERABLE PRIVATE LICENSES VESTED THEM WITH VALID AND COGNIZABLE PROPERTY INTERESTS .......... 2

A. CONTRACT RIGHTS ARE PROPERTY INTERESTS PROTECTED BY THE TAKINGS CLAUSE .......... 2

B. PLAINTIFFS' RIGHTS UNDER THEIR PRIVATE, EXCLUSIVE AND TRANSFERABLE LICENSE WERE PROPERTY INTERESTS PROTECTED BY THE TAKINGS CLAUSE .......... 3

1. DEFENDANT RELIES UPON CASES INVOLVING NON-EXCLUSIVE, NON-TRANSFERABLE, REVOCABLE PERMITS .......... 4

2. PLAINTIFFS' LICENSE HERE WAS EXCLUSIVE, TRANSFERABLE, AND IRREVOCABLE .......... 6

3. THE GOVERNMENT'S REGULATION OF FISHING DOES NOT NEGATE PLAINTIFFS' PROPERTY INTEREST IN THE LICENSE .......... 9

4. THE EXECUTIVE ORDER ESTABLISHING THE PALMYRA DEFENSE AREAS WAS REVOKED IN 1947 .......... 10

II. NOTHING IN THE LICENSES TERMINATES PLAINTIFFS' PROPERTY INTEREST OR ASSIGNS THE CLAIMS PLAINTIFFS PRESENT HERE .......... 11

A. THE TERMINATION PROVISION OF THE LICENSE HAD NO EFFECT IN THE CIRCUMSTANCES PRESENTED HERE — A TAKING OF PLAINTIFFS RIGHTS UNDER THE LICENSE .......... 11

B. THE PARTIES' CONTINUED PERFORMANCE OF THE LICENSE AGREEMENT DEMONSTRATES THAT THE TERMINATION PROVISION WAS NEVER EFFECTUATED .......... 13

III. PLAINTIFFS DO NOT OBJECT TO THE DISMISSAL OF PLAINTIFF KRE .......... 14

CONCLUSION .......... 14

## TABLE OF AUTHORITIES

**Cases**

*Alves v. United States*,
133 F.3d 1454 (Fed. Cir. 1998)....3, 6

*American Pelagic Fishing Co., L.P. v. United States*,
379 F.3d 1363 (Fed. Cir. 2004)....3, 5

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003)....3, 10

*Conti v. United States*,
291 F.3d 1334 (Fed. Cir. 2002)....3, 4, 5

*Dolan v. City of Tigard*,
512 U.S. 374 (1994)....4

*Huntleigh USA Corp. v. United States*,
63 Fed. Cl. 440 (2005)....9, 10

*Jackson v. United States*,
103 F. Supp. 1019 (Ct. Cl. 1952)....4, 8, 9

*Lynch v. United States*,
292 U.S. 571 (1934)....2

*Members of the Peanut Quota Holders Assoc., Inc. v. United States*,
421 F.3d 1323 (Fed. Cir. 2005)....8

*Orange Cove Irr. Dist. v. United States*,
28 Fed. Cl. 790 (1993)....7

*Pollard's Lesse v. Hagen*,
44 U.S. 212 (1845)....12

*Todd v. United States*,
292 F.2d 841 (Ct. Cl. 1961)....4, 9

*United States v. California*,
332 U.S. 19 (1947)....12

*United States Trust Co. of New York v. New Jersey*,
431 U.S. 1 (1977)....2, 15

## INTRODUCTION

Plaintiffs Kingman Reef Enterprises, L.L.C. ("KRE"); Palmyra Pacific Enterprises, L.L.C. ("PPE"); PPE Limited Partnership ("PPELP"); Palmyra Pacific Seafoods, L.L.C. ("PPS"); and Frank Sorba ("Sorba") (collectively, the "Plaintiffs") oppose defendant's motion to dismiss Plaintiffs' complaint or, in the alternative, for summary judgment.

In January 2001, Plaintiffs held property interests in the form of irrevocable, private, transferable licenses that granted them the exclusive right to establish a commercial fishing operation using an airstrip, harbor, and base camp on the emergent land of Palmyra — a remote Pacific atoll that is the only suitable location in the Palmyra U.S. Exclusive Economic Zone ("EEZ") for a land-based commercial fishing and transshipment operation such as Plaintiffs' enterprise. Plaintiffs spent millions of dollars developing their property rights and held reasonable, investment-backed expectations of economic returns from them. Within months of Plaintiffs' commencement of commercial fishing operations from their base on Palmyra, however, the government established the Palmyra National Wildlife Refuge in the waters surrounding Plaintiffs' commercial fishing base and "close[d] the refuge to commercial fishing."[1] In establishing the Palmyra National Wildlife Refuge and "clos[ing] the refuge to commercial fishing," the government took Plaintiffs' rights under their licenses and rendered them worthless. Contrary to the defendant's contention, nothing in the licenses terminated or assigned Plaintiffs' claims against the government for that taking.

Plaintiffs have adequately pled their takings claims, and the government's legal arguments fail. Accordingly, Plaintiffs respectfully urge the Court to deny defendant's motion and to order the defendant to answer Plaintiffs' amended complaint promptly. Plaintiffs

[1] *See* First Amended Complaint ("Am. Compl.") Ex. H.

acknowledge that the complaint as amended does not advance claims on behalf of KRE, and Plaintiffs are amenable to dismissing KRE from the case.

## I. PLAINTIFFS' EXCLUSIVE AND TRANSFERABLE PRIVATE LICENSES VESTED THEM WITH VALID AND COGNIZABLE PROPERTY INTERESTS

The defendant's principal argument is that Plaintiffs' "alleged right is not a property right, but, rather, is a contractual right" arising out of a license agreement,[2] that "no property rights are created in permits and licenses,"[3] and that Plaintiffs therefore purportedly had no property interest that could support a viable takings claim. The defendant is not correct.

### A. CONTRACT RIGHTS ARE PROPERTY INTERESTS PROTECTED BY THE TAKINGS CLAUSE

The defendant's argument that contract rights cannot form the *res* underlying a takings claim contradicts longstanding and well-established precedent, and is simply wrong. The Supreme Court, in the 1934 *Lynch* case, held that "[v]alid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States,"[4] and permitted the plaintiff to pursue a takings claim where the government had legislatively negated his contract rights. Similarly, in the 1977 *U.S. Trust* case, the Supreme Court reiterated that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."[5]

Accordingly, in the 2003 *Cienega Gardens* decision, the Federal Circuit confirmed "there is . . . ample precedent for acknowledging a property interest in contract rights under the Fifth

[2] Defendant's Motion to Dismiss Plaintiff's First Amended Complaint ("Def. Br.") 13.

[3] *Id*. at 8, 12 (internal quotation marks and citations omitted).

[4] *Lynch v. United States*, 292 U.S. 571, 579 (1934).

[5] *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 n.16 (1977) (citations omitted).

Amendment."[6] In *Cienega Gardens*, the Court of Appeals explained that the plaintiffs "had unequivocal contractual rights . . . to prepay their mortgages; thus they had a property interest in those rights — both in the subject matter of the contract (the real property rights) *and in the contract itself*,"[7] and reversed the trial court's judgment that no compensable taking could have occurred when the government legislatively negated a material term of the mortgage agreement.

Here, the defendant concedes, as it must, that Plaintiffs have adequately pled that a series of contractual licenses granted Plaintiffs the right "to use Palmyra 'for commercial fishing and related transport and support operations.'"[8] Under *Lynch*, *U.S. Trust*, and *Cienega Gardens*, Plaintiffs' exclusive and transferable contractual rights under those licenses are property interests protected by the Fifth Amendment's takings clause.

### B. PLAINTIFFS' RIGHTS UNDER THEIR PRIVATE, EXCLUSIVE AND TRANSFERABLE LICENSE WERE PROPERTY INTERESTS PROTECTED BY THE TAKINGS CLAUSE

The defendant's argument that Plaintiffs' rights under their contractual license are insufficient to support a takings claim because, purportedly, "no property rights are created in permits and licenses"[9] not only ignores the binding precedent of *Lynch*, *U.S. Trust* and *Cienega Gardens*, but also fails on its own terms. In the cases defendant cites to support its argument — *Conti*,[10] *American Pelagic*,[11] and *Alves*[12] — the "permits and licenses" were government-granted, non-transferable permits that conveyed no exclusive rights. Here, by contrast,

---

6 *Cienega Gardens v. United States*, 331 F.3d 1319, 1329 (Fed. Cir. 2003) (citations omitted).

7 *Id*. at 1330 (emphasis added).

8 Def. Br. 6 (quoting Am. Compl. Ex. A at 2).

9 *Id*. at 8, 12 (internal quotation marks and citations omitted).

10 *Conti v. United States*, 291 F.3d 1334 (Fed. Cir. 2002).

11 *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363 (2004).

12 *Alves v. United States*, 133 F.3d 1454 (Fed. Cir. 1998).

Plaintiffs' *private license* was *transferable* and it conveyed to Plaintiffs the *exclusive right* to establish a commercial fishing operation using an airstrip, harbor, and base camp on Palmyra. The distinction is critical, as *American Pelagic*, *Conti*, and *Alves* — as well as the decisions of this Court's predecessor in *Jackson*[13] and *Todd*[14] — all demonstrate.

### 1. DEFENDANT RELIES UPON CASES INVOLVING NON-EXCLUSIVE, NON-TRANSFERABLE, REVOCABLE PERMITS

Defendant relies principally upon *Conti*.[15] In that case, the plaintiff claimed that a change in government regulations effectively took a swordfishing permit the government had granted him. In holding that the plaintiff lacked a cognizable property interest in the permit, the Federal Circuit noted that the plaintiff "could not assign, sell or otherwise transfer the permit," and explained that the "rights to sell, assign, or otherwise transfer are traditional hallmarks of property."[16] The Court of Appeals explained that "[f]urther, since the swordfishing permit did not confer exclusive fishing privileges, permit holders like Mr. Conti lacked the authority to exclude others from the Atlantic Swordfish Fishery," and relied upon the Supreme Court's 1994 *Dolan* decision for the proposition that "the right to exclude others is one of the most essential sticks in the bundle of rights that are commonly characterized as property."[17] Finally, the Federal Circuit also held that "the government at all times retained the right to revoke, suspend, or modify the permit."[18] Based upon those attributes of the permit, the Court of Appeals

[13] *Jackson v. United States*, 103 F. Supp. 1019 (Ct. Cl. 1952).

[14] *Todd v. United States*, 292 F.2d 841 (Ct. Cl. 1961).

[15] *See* Def. Br. 12-14.

[16] *Conti*, 291 F.3d at 1341.

[17] *Id*. (quoting *Dolan v. City of Tigard*, 512 U.S. 374, 384 (1994) (internal quotation marks and citations omitted)).

[18] *Id*. at 1341-42 (citations omitted).

concluded that "[t]he absence of crucial indicia of a property right, coupled with the government's irrefutable retention of the right to suspend, revoke, or modify Mr. Conti's swordfishing permit, compels the conclusion that the permit bestowed a revocable license, instead of a property right."[19]

Neither does *American Pelagic*, upon which the defendant also relies, support the defendant's arguments. In *American Pelagic*, the Federal Circuit noted that the plaintiff's fishing permit had been issued by the government pursuant to a statutory regime under which the "permits were not transferable or assignable, . . . did not confer exclusive fishing privileges[,] . . . and . . . could be revoked, suspended or modified by the government."[20] Thus, the Court of Appeals explained that "[t]here is simply no contention that American Pelagic had the authority to assign, sell, or transfer its permits and authorization letter, nor that it was granted exclusive privileges to fish for Atlantic mackerel and herring in the EEZ."[21] The Circuit, quoting *Conti*, concluded that "[t]his 'absence of crucial indicia of a property right, coupled with the government's irrefutable retention of the right to suspend, revoke or modify' the . . . permit 'compels the conclusion that the permit bestowed a revocable license, instead of a property right.'"[22]

Likewise, in *Alves*, the Court of Appeals held that the plaintiff had no compensable property interest in either (1) grazing permits that were "freely revocable by the government without compensation" or (2) a grazing preference that the Court held not materially

[19] *Id*. at 1342 (citations omitted).

[20] *Am. Pelagic*, 379 F.3d at 1373 (citations omitted).

[21] *Id*. at 1374 (footnote omitted).

[22] *Id*. (quoting *Conti*, 291 F.3d at 1342).

distinguishable from the grazing permits for Fifth Amendment purposes.[23] In any event, the issue resolved by *Alves* — whether the government's purported failure to control trespassing third parties, rather than government's own action, can sustain a takings claim — is simply irrelevant to the determination of the validity and enforceability of Plaintiffs' takings claims here. In *Alves,* the Circuit held that the claim presented "*differs from the usual regulatory takings claim* because it is premised not on governmental action but on the inaction of the [Bureau of Land Management] in its failure to abate the trespass" of a neighboring rancher's livestock, and held that "[t]he [BLM]'s failure to do so successfully does not breach any duty owing to Alves, and does not constitute a taking under the Fifth Amendment."[24]

### 2. PLAINTIFFS' LICENSE HERE WAS EXCLUSIVE, TRANSFERABLE, AND IRREVOCABLE

The defendant acknowledges that the licenses grant Plaintiffs "some exclusive rights,"[25] but claims that these rights are somehow insufficient to support a property interest. The defendant is not correct. The sum and substance of the Plaintiffs' license is an exclusive entitlement to establish and to operate a commercial fishing operation using an airstrip, harbor, and base camp on Palmyra. The plain language of the license grants Plaintiffs:

- "*the exclusive right* and license to occupy . . . the Base Camp,"[26] where Plaintiffs were to locate "such housing units, storage facilities, fish drying sheds, communication facilities and other facilities and improvements as [Plaintiffs] shall deem desirable to support [their] . . . operations;"[27]

---

23 *Alves*, 133 F.3d at 1456-57.

24 *Id*. at 1457-58 (emphasis added).

25 Def. Br. 13.

26 Am. Compl. Ex. A at 3 (emphasis added).

27 *Id*. at 4.

- "*the exclusive right* and license to transport seafood and seafood products harvested under this Agreement for commercial (resale) purposes, as well as individuals, equipment, supplies and materials in support of commercial fishing operations, to or from Palmyra;"[28]

- "*the exclusive right* and license to use the existing aircraft runway at Palmyra for take-off and landing of aircraft in support of [Plaintiffs'] commercial fishing operations;"[29] and

- "*the exclusive right* to use one-half of the deep water dock" for Plaintiffs' commercial fishing operations.[30]

These provisions are plainly sufficient to demonstrate that Plaintiffs held the exclusive right to establish and to operate a commercial fishing and transshipment operation on Palmyra.

The plain text of Plaintiffs' license also establishes that Plaintiffs rights were transferable. The agreement contains an express "assignment" provision that contemplates that Plaintiffs' would transfer the license and provides that the proceeds of any sale of Plaintiffs' rights under the license would be shared with the Licensor.[31] To be sure, the assignment provision of the agreement conditions any such transfer on Plaintiffs' securing the "Licensor's prior written consent,"[32] but the implied covenant of good faith required the Licensor to exercise that discretion reasonably,[33] such as to protect the Licensor's interest in dealing only with known parties whose creditworthiness and business reputations would meet the Licensor's standards. Conditions on a property holder's right to transfer the property are common and do not render

[28] *Id*. at 9 (emphasis added).

[29] *Id*. at 10 (emphasis added).

[30] *Id*. at 12 (emphasis added).

[31] *See id*. at 35.

[32] *Id*.

[33] *See Orange Cove Irr. Dist. v. United States*, 28 Fed. Cl. 790, 800 (1993) ("When one party has the authority to exercise discretion to determine an essential term of a contract, as here, the covenant of good faith and fair dealing requires that the exercise of that discretion be reasonable.").

the property non-transferable for Fifth Amendment purposes. Indeed, in the 2005 *Peanut Quota Holders* decision, the Federal Circuit held that for takings purposes, peanut farmers had property rights in quota allotments that had strict, statutory limitations on transferability, and that notwithstanding those limitations, the quota allotments "are transferable."[34] The Court of Appeals expressly "disagree[d]" with "the government's argument . . . that quotas are not transferable," holding instead that "[t]he mere fact that transfers of allotments are not unrestricted does not undermine the importance of transferability to the characterization of quotas as a form of property," and that "the transferability of the quotas supports the conclusion that the quotas constitute property."[35]

Here, Plaintiffs' license agreement is not freely revocable by either party; rather, specific events of default are enumerated with specific consequences set forth expressly.[36]

All of these attributes demonstrate that unlike the mere permits at issue in *Conti*, *American Pelagic*, and *Alves*, Plaintiffs' license here constitutes a property right protected by the Fifth Amendment. Indeed, in *Jackson* and *Todd*, the Court of Claims held that fishing licenses with even fewer indicia of property were protected by the takings clause, and that the holders of those permits were entitled to just compensation when government action rendered the permits worthless. In *Jackson*, for example, the plaintiff's fishing license "had one quality of a property right, the quality of alienability."[37] The Court acknowledged that the plaintiff "fished only by

[34] *Members of the Peanut Quota Holders Assoc., Inc. v. United States*, 421 F.3d 1323, 1333 (Fed. Cir. 2005).

[35] *Id*. at 1332, 1333. Although the Circuit also held that no taking took place, it did so based on factors not presented here — the Court held that the because the quotas were created by government and the government retained the authority to alter or extinguish the benefits available under the quota program, the farmers' property interest in their quota allotments was not compensable under the takings clause. *Id*. at 1334-35.

[36] Am. Compl. Ex. A at 37-40.

[37] *Jackson*, 103 F. Supp. at 1020.

license from and at the suffrance of the State of Maryland, which could have changed its law at any time and refused him a further license," yet nevertheless concluded that "the plaintiff had a sort of property right" that the Government was liable for taking when a military designation placed off-limits the grounds plaintiff had been licensed to fish.[38] The *Todd* decision involves substantially similar facts and also holds that the plaintiff was due compensation for the government's taking.[39]

Here, as described above, Plaintiffs' license encompasses not only the one quality of a property right held sufficient in *Jackson* and *Todd*, but all of the attributes held lacking in *Conti* and *American Pelagic* — exclusivity, transferability and irrevocability. Plaintiffs' rights under the license constitute a property interest sufficient to support their claims.

### 3. THE GOVERNMENT'S REGULATION OF FISHING DOES NOT NEGATE PLAINTIFFS' PROPERTY INTEREST IN THE LICENSE

The Federal Circuit's decision in *Cienega Gardens* and the Court of Federal Claims' 2005 decision in *Huntleigh*[40] demonstrate that the fact that Plaintiffs' license relates to a regulated industry — fishing — does not change the fact that Plaintiff's rights under their license constitute property protected by the Fifth Amendment. In *Cienega Gardens*, the contract at issue involved a mortgage agreement relating to government-subsidized housing, thereby occupying the intersection of two highly regulated fields. The Federal Circuit nevertheless held that plaintiffs "had unequivocal contractual rights . . . to prepay their mortgages; thus they had a property interest in those rights — both in the subject matter of contract (the real property rights)

---

[38] *Id*.

[39] *See generally Todd*, 292 F.2d 841 (government liable for taking fishing permit when defense designation placed fishing grounds off limits).

[40] *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440 (2005).

*and in the contract itself*."[41] Similarly, *Huntleigh* involved the government's taking of plaintiff's contractual right to provide airport security services — another highly regulated field — yet the court held that "plaintiff's allegation that it had a contractual right to provide screening services to various airlines sufficiently sets forth a property interest."[42]

### 4. THE EXECUTIVE ORDER ESTABLISHING THE PALMYRA DEFENSE AREAS WAS REVOKED IN 1947

The defendant cites and extensively quotes a World-War-II-era executive order, Executive Order 8682, that "established a Naval Defensive Sea Area and Naval Airspace Reservation" around Palmyra.[43] The defendant's exegesis may leave the impression that the order was in effect at some time relevant to this case, and that therefore the government might have been able to apply the Order's terms to limit Plaintiffs' access to Palmyra for purposes of their commercial fishing enterprise. Indeed, the defendant juxtaposes its discussion of Executive Order 8682 with a summary of another, irrelevant, Executive Order (relating to several other Pacific islands but not to Palmyra) that the defendant notes "has never been revoked."[44]

But the portions of Executive Order 8682 that relate to Palmyra *have* been revoked. As a small "editorial note" at the bottom of defendant's Exhibit B explains, "Executive Order 9881 of Aug. 4, 1947 . . . *discontinued the Palmyra Island Naval Airspace Reservation and the Palmyra Island Naval Defensive Sea Area*."[45] Accordingly, Executive Order 8682 has not been in effect at any relevant time, and its terms in no way limit Plaintiffs' property interest in their license.

---

41 *Cienega Gardens*, 331 F.3d at 1330 (emphasis added).

42 *Huntleigh*, 63 Fed. Cl. at 444 (citing *Cienega Gardens*, 331 F.3d at 1329-30).

43 Def. Br. 4 (citing Executive Order 8682, Def. Ex. B).

44 *Id*. (discussing Executive Order 6935, Def. Ex. A, which relates to Kingman Reef).

45 Def. Br. Ex. B (emphasis added).

## II. NOTHING IN THE LICENSES TERMINATES PLAINTIFFS' PROPERTY INTEREST OR ASSIGNS THE CLAIMS PLAINTIFFS PRESENT HERE

The defendant argues that "the plain language of the license limited the compensable rights of the [Plaintiffs] solely to [their] own buildings, equipment and fixtures, and retained all other compensable rights for . . . the Licensor."[46] That argument is wrong. The defendant erroneously assumes that "the license agreement itself terminated plaintiffs' rights in the event of a taking," and incorrectly concludes that "assuming a taking took place as plaintiffs allege, the license and all of plaintiffs' claimed compensable expectancy under it ceased and terminated 'at once.'"[47] In fact, the "Condemnation" provision of the agreement upon which the defendant relies is strictly limited in its scope to circumstances that did not arise in this case, and the provision's terms therefore never took effect, but even if the provision were incorrectly assumed to have some potential application, the parties' subsequent behavior demonstrates that they waived the provision.

### A. THE TERMINATION PROVISION OF THE LICENSE HAD NO EFFECT IN THE CIRCUMSTANCES PRESENTED HERE — A TAKING OF PLAINTIFFS RIGHTS UNDER THE LICENSE

The defendant goes astray by misreading section 7.01 of the license agreement. Article seven of the license is entitled "Condemnation," and section 7.01 bears the heading "Taking of Property." That section specifies that if "the *Property* or any part thereof, or any other part of Palmyra which Licensee is permitted to use under this Agreement, shall be required, taken or condemned by any authority having the power of eminent domain, then this Agreement shall at once cease and terminate."[48]

---

[46] Def. Br. 7.

[47] *Id*. at 16.

[48] Am. Compl. Ex. A at 33 (emphasis added).

The defendant accurately quotes the provision, but has overlooked the fact that the taking alleged here, the taking of Plaintiffs' rights under the license, was not a taking of "the Property" as that term is defined in the agreement. The critical term "Property" — which is capitalized each time it appears in the section — is defined in Section 1.08(1)(b) of the license. That section states that "[f]or purposes of this Agreement, the term 'Property' means and includes all of the *real property* on Palmyra Atoll, together with all buildings and other improvements now or hereafter located thereon, which Licensee is entitled to use, occupy or enjoy, exclusively or non-exclusively, under this Agreement."[49] Indeed, the defendant correctly notes that the interests in Palmyra of the Fullard-Leo family (the ultimate source of Plaintiffs' license rights) extended only to "emergent land."[50] Accordingly, the Fullard-Leos lacked authority to grant any license in the tidal lands, submerged lands, or surrounding waters, and the government could not have taken any tidal lands, submerged lands, or surrounding waters.[51] Thus, what the parties to the license agreed was that the agreement would terminate if a condemning authority took by eminent domain emergent land or fixtures appurtenant to the emergent land; that never happened.

As the defendant admits, when the government designated the Palmyra National Wildlife Refuge, "[t]he refuge consisted of tidal lands, submerged lands, and waters" — *not* emergent land and therefore *not* the "Property" defined in the license. Indeed, the defendant acknowledges that to the extent the government has acquired any of the emergent land of Palmyra, the government has done so by voluntary private conveyance, not by condemnation or eminent

[49] *Id*. at 15 (emphasis added).

[50] Def. Br. 5.

[51] *See id*. at 6 (citing *Pollard's Lesse v. Hagen*, 44 U.S. 212, 228-29 (1845), *United States v. California*, 332 U.S. 19, 34-35, 38 (1947)).

domain.[52] Thus the "Property" that, if taken, could trigger Section 7.01 — the emergent land of Palmyra (in contrast to Plaintiffs' license rights, which constitute the *res* underlying this action) — was never taken, and Section 7.01 therefore never terminated the license agreement.

### B. THE PARTIES' CONTINUED PERFORMANCE OF THE LICENSE AGREEMENT DEMONSTRATES THAT THE TERMINATION PROVISION WAS NEVER EFFECTUATED

The defendant also errs in ignoring the subsequent behavior of the parties to the license agreement. Rather than treating the agreement as terminated, the parties unequivocally affirmed its continued vitality after the wildlife refuge had been designated. As the defendant admits, the parties to the license agreement made certain that subsequent transfers of Palmyra were "subject to the unrecorded license agreement at issue here."[53] Had the agreement "ceased and terminated at once" upon the designation, as the defendant claims, there would have been no need and no reason to make any subsequent transfer "subject to" a non-existent agreement.

Thus parties' behavior subsequent to the government's designation of the Palmyra National Wildlife Refuge conclusively demonstrates that either (1) Section 7.01 was not intended to operate (and therefore did not operate) in the circumstances that actually arose, or (2) the parties modified their agreement to waive any potential application of Section 7.01. In either event, the license was not terminated and Plaintiffs retained their property interest in their rights under the license.

By establishing the Palmyra National Wildlife Refuge and "clos[ing] the refuge to commercial fishing," the government took Plaintiffs' rights under their licenses and rendered them worthless; Plaintiffs are entitled to just compensation.

---

[52] *Id*. at 5-6, 15.

[53] *Id*. at 6 (citing Def. Br. Exs. D, E).

## III. PLAINTIFFS DO NOT OBJECT TO THE DISMISSAL OF PLAINTIFF KRE

The defendant correctly observes that plaintiff "KRE is a party to none of [the license] agreements" pled in the amended complaint, "and is only mentioned in the caption of the amended complaint," *i.e.*, not in the substantive allegations.[54] Plaintiffs agree that none of KRE's property interests are at issue under the complaint as amended, and that no purpose would be served by KRE's continued presence in the action. Because, however, the defendant has styled its motion as, in part, one for summary judgment, Plaintiffs can no longer dismiss KRE voluntarily pursuant to RCFC 41(a)(i). Plaintiffs will prepare a stipulation of dismissal removing KRE's claims for this action pursuant to RCFC 41(A)(ii) and present it to the defendant shortly.

## CONCLUSION

Plaintiffs held a contractual license to establish a commercial fishing operation using an airstrip, harbor, and base camp on Palmyra — the only location where such an enterprise could be established in the vast and richly stocked Palmyra EEZ — and invested millions of dollars in reliance on those contract rights. By 2000, Plaintiffs had completed their preparations and commenced commercial fishing. But in January 2001, the government created the Palmyra National Wildlife Refuge, which surrounded Plaintiffs' operational base, and "close[d] the refuge to commercial fishing."[55] This government action rendered Plaintiffs' property interests in and relating to their license worthless.

Because Plaintiffs based their business on private, exclusive, and transferable contract rights, this case is dispositively different from cases such as *American Pelagic*, *Conti*, or *Alves*, where plaintiffs sought unsuccessfully to establish protected property rights in public, non-

---

[54] *Id*. at 19.

[55] *See* Am. Compl. Ex. H.

exclusive, revocable and non-transferable licenses and permits. Moreover, because the government did not condemn or otherwise take the emergent land of Palmyra, the "Condemnation" clause of Plaintiffs' license was not triggered, and none of Plaintiffs' rights were transferred or terminated pursuant to that clause.

As the Supreme Court has held, "[c]ontract rights are a form of property and as such may be taken for a public purpose *provided that just compensation is paid*."[56] The government took Plaintiffs' contractual right to establish a commercial fishing operation using an airstrip, harbor, and base camp on Palmyra, but paid *no compensation* — just or otherwise. Accordingly, Plaintiffs urge the Court to deny the defendant's motion and to order the defendant to answer Plaintiffs' Amended Complaint within 10 days.

Dated: August 10, 2007

Respectfully submitted,

/s/ Howard N. Cayne

Howard N. Cayne
ARNOLD & PORTER LLP
555 Twelfth Street, NW
Washington, DC 20004
Tel: (202) 942-5000
Fax: (202) 942-5999

*Counsel for plaintiffs Kingman Reef Enterprises, L.L.C.; Palmyra Pacific Enterprises, L.L.C.; PPE Limited Partnership; Palmyra Pacific Seafoods, L.L.C.; and Frank Sorba*

*Of counsel*:
David B. Bergman
Michael A. Johnson

---

[56] *U.S. Trust*, 431 U.S. at 19 n.16 (emphasis added).