IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| PALMYRA PACIFIC SEAFOODS, L.L.C., a Washington limited liability company; PALMYRA PACIFIC ENTERPRISES, L.L.C., a Washington limited liability company; PPE LIMITED PARTNERSHIP, a Washington limited partnership; KINGMAN REEF ENTERPRISES, L.L.C., a Washington limited liability company; and FRANK SORBA, an individual, Plaintiffs, | No. 07-35C |
| v. | (Judge Eric G. Bruggink) |
| THE UNITED STATES, Defendant. | |

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

Defendant, the United States, respectfully submits the following reply to the opposition to our motion to dismiss filed by plaintiffs Palmyra Pacific Seafoods, L.L.C. ("PPS"), Palmyra Pacific Enterprises, L.L.C. ("PPE"), PPE Limited Partnership ("PPE"), Kingman Reef Enterprises, L.L.C. ("KRE"), and Frank Sorba ("Sorba") (collectively, "plaintiffs").

## I. Plaintiffs' License Is Not A Compensable Property Interest For Purposes Of A Fifth Amendment Taking

In their opposition, plaintiffs attempt to distinguish their license from the licenses in Conti v. United States, 291 F.3d 1334 (Fed. Cir. 2002); American Pelagic Fishing Co., L.P. v. United States, 379 F.3d 1363 (Fed. Cir. 2004); and Alves v. United States, 133 F.3d 1454 (Fed. Cir. 1998). Plaintiffs argue

that their license is an exclusive, transferable and non-revocable license, and that this is sufficient to convert their license into a compensable property interest for purposes of a Fifth Amendment taking. Pl. Opp. 6-7.

First, plaintiffs reliance upon Jackson v. United States, 103 F.Supp. 1019 (Ct. Cl. 1952) and Todd v. United States, 292 F.2d 841 (Ct. Cl. 1961) is misplaced. The United States Supreme Court held in United States v. Fuller, 409 U.S. 488 (1973), that licenses and permits are not compensable property interests for purposes of a Fifth Amendment taking. In addition, the Court of Appeals for the Federal Circuit noted in Conti that an issue existed as to whether Jackson and Todd remain valid precedent in light of the Supreme Court's decision in Fuller. Conti, 291 F.3d at 1342, n7.

In Fuller, the Supreme Court focused on the revocability of the grazing permits at issue and the clear expression of Congress that the permits "shall not create any right, title, interest or estate in or to the lands" in determining that the permits were not a compensable property interest for purposes of a Fifth Amendment taking. Fuller, 409 U.S. at 489. Likewise, in this case, plaintiffs' license was revocable in the event of plaintiffs' default or in the event of a taking or condemnation, Amend. Compl. Ex. A at 33-34, 38, and the license clearly stated that it did not create any right, title, interest or estate in

the waters or adjacent lands subject to the license. Section 1.03 (7) of the license provides that:

> Licensee acknowledges and agrees that this Agreement shall not affect Licensor's or Master Lessor's legal and equitable title to the waters covered by this license and Licensee shall not claim any title or interest in said waters or any land adjacent thereto.

Id. at 7.

Moreover, the permits issued in Jackson and Todd were issued by the State of Maryland and gave plaintiffs the exclusive right to fish in a specified area of Chesapeake Bay. Jackson, 103 F.Supp. at 1019-20; Todd, 292 F.2d at 843. The permits also could be sold or passed by inheritance. Jackson, 103 F.Supp. at 1020; Todd, 292 F.2d at 843. In this case, the license explicitly states "No Assignment" and provides that plaintiffs "agree[] not to sell, assign, transfer, license, mortgage or otherwise encumber all or any portion of its interest . . . without Licensor's prior written consent, which may be withheld by Licensor in its sole and absolute discretion." Amend. Compl. Ex. A at 35.

Even if the Licensor consented to a transfer, half of the proceeds resulting from the transfer had to be paid to the licensor, and the license did not entirely transfer as the license would continue to hold the licensee responsible. Id.

Section 8.02 of the license is titled "No Release of Licensee" and provides that:

> No permitted sale, assignment, transfer, license, mortgage, or other encumbrance of Licensee's interest in this Agreement shall in any way release Licensee from any liability or responsibility of Licensee under this agreement.

Id.

This is distinguishable from Jackson and Fuller where the permits were readily transferable without restrictions, and from Members of the Peanut Quota Holders Assoc., Inc. v. United States, 421 F.3d 1323 (Fed. Cir. 2005), where restrictions were only placed upon the party to whom the quotas could be transferred. Jackson, 103 F.Supp. at 1020; Todd, 292 F.2d at 843. Accordingly, the license in this case is more similar to the licenses in Conti, American Pelagic and Alves, than to the licenses in Jackson and Fuller, because plaintiffs here did not have the right to fully transfer the license.

Moreover, plaintiffs' citations to Lynch v. United States, 292.U.S. 571 (1934) U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1 (1977); Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003); and Huntleigh USA Corporation v. United States, 63 Fed. Cl. 440 (2005) are inapplicable because each of those cases involved a valid contract right, not a license or permit for a use as in this case, Conti, American Pelagic, and Alves. See Lynch, 292 U.S. at 579 ("Valid contracts are property,

whether the obligor be a private individual, a municipality, a state, or the United States.”). Indeed, this Court, in Huntleigh, explicitly distinguished itself from a case involving licenses. 63 Fed. Cl. at 447.

Second, plaintiffs have not identified a single precedential decision where a license such as plaintiffs' was held to be a compensable property interest for purposes of a Fifth Amendment taking. Licenses and permits are not compensable property interests because, by their nature, traditional hallmarks of property are not transferred with them. Conti, 291 F.3d at 1340. In this case, plaintiffs have no compensable property interest. Instead, what they have is a right to use the licensor's property interest for a limited period of time and for a specific purpose. Amend. Compl. Ex. A at 1 (“Licensor has agreed to execute this Agreement with Licensee with the understanding by both parties that the rights granted to Licensee hereunder are restricted to specific activities in specific areas for a limited period of time.”). This use right is simply not compensable for purposes of a Fifth Amendment taking. Conti, 291 F.3d at 1340.

Moreover, the license is a mixture of rights labeled “exclusive” and “non-exclusive.” In their opposition, plaintiffs claim four exclusive rights conveyed to them by the license. Pl. Opp. 6-7. A closer reading of the license, however, reveals that these “exclusive” rights are only tiny parts of a stick in the

bundle of property rights. For example, Section 1.02 of the license provides plaintiffs

> the exclusive right and license to occupy, use and enjoy during the Term (<u>subject only to the rights of the Master Lessor and Licensor hereunder</u>) . . . the Base Camp"

<u>See</u> Amend. Compl. Ex. A at 3, Pl. Opp. 6. Accordingly, plaintiffs' right under Section 1.02, although labeled "exclusive," is not exclusive because it is subject to the rights of the Master Lessor, the owners of Palmyra at the time, and the licensor, PDC.

Similarly, plaintiffs allege exclusive rights to transport seafood (section 1.04 of the license), to use the aircraft runway (section 1.05 of the license), and to use one-half of the deep water dock (section 1.06(3)). Pl. Opp. 6-7. However, these "exclusive" rights are seriously limited. The lessor retains the right to allow others to use the runway, the deep water dock, and to transport individuals, equipment, supplies and materials for any other commercial purpose that is not fishing. Amend. Compl. Ex. A at 3, 9, 10, 12. Under plaintiffs' proposed theory, the owners of Palmyra could have issued a million licenses to use the runway on Palmyra, each for a million different exclusive business ventures, and each one of them would be a compensable property interest for purposes of a Fifth Amendment taking. This Court should refuse to adopt such a broad, overwhelming and unsupported concept.

Accordingly, because plaintiffs can not identify a compensable property interest for purposes of a Fifth Amendment taking, plaintiffs' complaint should be dismissed for failure to state a claim upon which relief can be granted, or, in the alternative, the Court should enter judgment as a matter of law for the United States.

## II. Contrary To Plaintiffs' Assertions, Even If Plaintiffs Had A Compensable Property Interest, That Property Interest Would Have Terminated Upon The Government's Alleged Taking

In their opposition, plaintiffs argue that the termination provision of the license agreement was never triggered because no real property on Palmyra was taken by the Government. Pl. Opp. 12. Even if real property had been taken, plaintiffs argue that the termination provision in the license had been waived by the parties. Id.

### A. Plaintiffs' Interpretation Of The Takings Provision In The License Agreement Is Contrary To Basic Contract Interpretation Rules

Article 7 of the license agreement states:

> Section 7.01. Taking of Property. In case at any time or times during the Term, the Property or any part thereof, **or any other part of Palmyra which Licensee is permitted to use under this Agreement**, shall be required, taken or condemned by any authority having the power of eminent domain, then this Agreement shall at once cease and terminate.
>
> All compensation and damages payable for or on account of all land and improvements shall be payable to and be the sole property of Licensor [i.e., PDC], except that Licensor agrees to pay to Licensee out of said

> compensation and damages an amount [defined in Article 7] . . . .
>
> In addition to the amount set forth above, Licensee shall also be entitled to claim and recover from the condemning authority, but not from Licensor, such compensation as may be separately awarded to or recovered by Licensee in its own right for any buildings, equipment and fixtures on the Property which are owned by Licensee, or the cost of relocation or removal thereof or for any loss or damage thereto, but not for any damage or loss to Licensee's improvements, business or operations under this Agreement.

Compl. Ex. A at 33-34 (emphasis added).

Plaintiffs argue that the term "Property," as used in Section 7.01, is limited to the "real property on Palmyra Atoll" Pl. Opp. 12. Plaintiffs interpret Section 7.01 to mean that the parties agreed "that the agreement would terminate if a condemning authority took by eminent domain emergent land or fixtures appurtenant to the emergent land." Id. Plaintiffs then admit that such a taking never happened. Id. Plaintiffs also admit that "the Fullard-Leos lacked authority to grant any license in the tidal lands, submerged lands, or surrounding waters, and the Government could not have taken any tidal lands, submerged lands, or surrounding waters." Id. Using this interpretation, plaintiffs conclude that the termination provision in Section 7.01 was never triggered because their license to establish a commercial fishing operation on Palmyra, and no real property, was allegedly taken by the Government. Pl.

Opp. 12-13. Plaintiffs' argument defies logic and contradicts statements made in their amended complaint.

Plaintiffs' interpretation completely and erroneously ignores the language in Section 7.01 that provides that the license would terminate if either the Property or "any other part of Palmyra which Licensee is permitted to use under this Agreement" is "required, taken or condemned." See NVT Technologies, Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004)(holding that when interpreting the language of a contract, a court gives reasonable meaning to all parts of the contract and does not render any portion meaningless). In order to give meaning to all parts of the license, the provision "any other part of Palmyra" must mean something other than the "Property." Therefore, under the rules of contract interpretation, the license agreement provides that if a per se or regulatory taking occurs on the real property or any other part of Palmyra that is not real property, the license terminates. Otherwise, to interpret Section 7.01 to apply only to the taking of real property, as plaintiffs suggest, renders important language in the license superfluous.

Plaintiffs argue that they are only alleging a taking of their right under the license to establish a commercial fishing operation, and that this is not included in Section 7.01. First, this Court has held that "mere engagement in a particular

business activity is not property protected by the Fifth Amendment." Huntleigh, 63 Fed. Cl. at 444; see also Huntleigh USA Corporation v. United States, 75 Fed. Cl. 642, 645 (2007). Second, plaintiffs' argument makes no sense. If the Government has not taken any Property or any other part of Palmyra which plaintiffs were permitted to use for their business, then the Government could not have taken their right under the license to establish a commercial fishing operation because inherent in that right is the right to use "part[s] of Palmyra." Indeed, in their amended complaint, plaintiffs acknowledge that "[p]laintiffs' property interests included the exclusive right to establish a commercial fishing operation on Palmyra using an airstrip, a deepwater dock, a small-boat harbor, and a base camp on [Palmyra]." Amend. Compl. 1-2; see also id. at 2 ("[Plaintiffs] established a commercial fishing operation on Palmyra using the Palmyra airstrip, dock, harbor, and base camp.").

Moreover, in their amended complaint, plaintiffs contradict their own argument by stating that "[t]he prohibition on public access and on commercial fishing . . . rendered worthless plaintiffs' property interests in . . . the improvements plaintiffs made to the commercial fishing facilities on Palmyra." Amend. Compl. 8. In fact, plaintiffs allege several times in their amended complaint that their right to use parts of Palmyra were taken by the Government. See Amend. Compl. 9 ("The United

States has permanently occupied and eliminated all of Plaintiffs' economically viable use of Palmyra and the surrounding waters; . . . and has eliminated all of Plaintiffs' economically viable use of the improvements Plaintiffs made to Palmyra pursuant to those licenses")(emphasis added); 10 (same).

B. The Plain Language Of The License And Plaintiffs' Actions Contradict Plaintiffs' Suggestion That The Parties Have Waived Section 7.01

Plaintiffs argue that even if a taking had occurred under Section 7.01, the parties, by their actions, modified the license agreement to waive this provision. Pl. Opp. 13. According to plaintiffs, the subsequent sale of Palmyra to The Nature Conservancy and, later, to the United States, were subject to the license agreement. Id. Plaintiffs argue that "[h]ad the agreement 'ceased and terminated at once' upon the designation, as the defendant claims, there would have been no need and no reason to make any subsequent transfer 'subject to' a non-existent agreement." Id.

Contrary to plaintiffs' assertion, the reference to the license in the sale agreements does not alone establish that Section 7.01 was waived. Most agreements, including the license in this case, contain provisions that survive termination of the agreement. For example, in this case, Section 11.01 of the license provides that, upon termination of the agreement,

> Licensee shall remove all buildings, improvements, equipment, furniture and trade

> fixtures placed by Licensee on the Property and shall repair all damage caused by such removal. Licensee's obligation under this Section 11.01 shall survive the expiration or earlier termination of the Term.
>
> If Licensee shall fail to remove all effects from said Property upon termination of this Agreement for any cause whatsoever, Licensor may, at its option, remove the same in any manner that Licensor shall choose, and store said effects without liability to Licensee for loss thereof, and Licensee agrees to pay Licensor any and all expenses incurred in such removal . . . .

Amend. Compl. Ex. A at 41 (emphasis added). Therefore, the reference to the license agreement does not necessarily mean the license was never terminated. It may have been referenced for the provisions that survive termination and are still in existence. Indeed, this is the only interpretation that does not conflict with other provisions in the license.

Section 16.06 of the license provides that any agreement to modify the license "shall be ineffective" "unless such agreement is in writing and signed by the party against whom enforcement of the change, modification, discharge or abandonment is sought." Amend. Compl. Ex. A at 45. Therefore, in order to modify the license to waive Section 7.01, the parties had to put such a modification in writing. No such writing exists, and, therefore, even if the references to the license in the sale agreements were meant to be a modification of Section 7.01, such a modification would be "ineffective."

Moreover, plaintiffs' own actions reflect that the license has been terminated. Plaintiffs' have not paid the monthly license fee required by the license since at least 2000.[1] Section 2.01 of the license requires plaintiffs, as licensees, to pay, at a minimum, a monthly license fee of $10,000 per month. Amend. Compl. Ex. A at 21. To date, neither The Nature Conservancy or the United States, as subsequent lessors, have ever received this payment.

Therefore, even if a taking occurred as plaintiffs allege, such a taking would have triggered Section 7.01 of the license, and the license would have "at once ceased and terminated." Amend. Comp. Ex. A at 33-34. Therefore, even if plaintiffs' had a compensable property interest pursuant to the Fifth Amendment, that interest no longer existed when the property was allegedly taken.

Accordingly, for this reason, and the reasons set forth in our motion, the United States respectfully requests that this Court dismiss plaintiffs' complaint for lack of subject matter jurisdiction, or, in the alternative, enter judgment as a matter of law for the United States.

---

[1] It is unknown to defendant when plaintiffs stopped paying the monthly license fee to the original lessor, Palmyra Development Company, Inc.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/Mark A. Melnick
MARK A. MELNICK
Assistant Director

s/Marla T. Conneely
MARLA T. CONNEELY
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel. (202) 305-3689
Fax. (202) 305-7643

September 5, 2007

Attorneys for Defendant