# In the United States Court of Federal Claims

No. 07-35L
(Filed January 22, 2008)

| | |
|---|---|
| **PALMYRA PACIFIC SEAFOODS, L.L.C., PALMYRA PACIFIC ENTERPRISES, L.L.C., PPE LIMITED PARTNERSHIP, and FRANK SORBA,**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | Takings; RCFC 12(b)(6) motion to dismiss; whether license is property interest; whether government action closing refuge to fishing took license to use land for commercial fishing operations. |

Howard N. Cayne, Washington, DC, for plaintiffs. David B. Bergman and Michael A. Johnson, Arnold & Porter LLP, of counsel.

Marla T. Conneely, Washington, DC, with whom was Assistant Attorney General Ronald J. Tenpas, for defendant. Mariel J. Combs, Department of Interior, of counsel.

## MEMORANDUM OPINION AND ORDER

**MILLER,** Judge.

This case is before the court after argument and supplemental briefing on defendant's motion to dismiss for failure to state a claim upon which relief can be granted or, in the alternative, its motion for summary judgment. Defendant contends that plaintiffs have no compensable property interest that could have been taken by lawful action of the Federal Government. The issue for decision is whether the Government, working in tandem with an influential environmental lobby, appropriated plaintiffs' property interest by prohibiting plaintiffs from commercial fishing off-island, which had the effect of rendering worthless plaintiffs' licenses for an on-island facility to support commercial fishing.

**FACTS**

The following facts are drawn from the complaint or are neutral facts that are neither disputed nor relied upon for decision. Palmyra Atoll ("Palmyra") and Kingman Reef are territories of the United States located approximately 1,000 nautical miles south of Hawaii and thirty-three nautical miles apart from each other. Palmyra and Kingman Reef are surrounded by a 200-nautical mile United States Exclusive Economic Zone ("EEZ") that excludes foreign fishing vessels. During World War II, the President of the United States issued an Executive Order establishing a Naval Defensive Sea Area and Naval Airspace Reservation over the territorial waters from the high-water mark out to a three-mile boundary surrounding Palmyra. Exec. Order No. 8682, 6 Fed. Reg. 1015 (Feb. 14, 1941), discontinued by Exec. Order No. 9881, 3 C.F.R. 662 (1943-1948). The United States at that time established a naval base on Palmyra, including an airstrip, dock, harbor, and base camp. On August 25, 2000, the Navy transferred custody of the Kingman Reef and surrounding reefs to the Department of the Interior ("Interior"), pursuant to the Federal Property and Administrative Services Act. Def.'s Br. filed July, 13, 2007, Ex. C.

Until a late 2000 sale to The Nature Conservancy, the Fullard-Leo family held title to the emergent land of Palmyra. Prior to July 1, 1999, the Fullard-Leo family assigned to Palmyra Development Co., Inc. ("PDC"), certain rights to Palmyra, including the right to convey an exclusive license to establish commercial fishing operations on Palmyra and to use the Palmyra airstrip, dock, harbor, and base camp for commercial fishing operations. On July 1, 1999, PDC entered into a license agreement with Palmyra Pacific Enterprises, L.L.C. ("PPE"), granting PPE the exclusive right to establish a commercial fishing operation on Palmyra and to use the airstrip, dock, harbor, and base camp for its operations. On November 17, 2000, PDC and the Fullard-Leo family executed a written consent allowing PPE to assign its rights under the license to PPE Limited Partnership ("PPELP") and allowing PPELP to sublicense its rights to Palmyra Pacific Seafoods, L.L.C. ("PPS"). In 2000, pursuant to its sublicense, PPS made substantial economic investments toward establishing, developing, and operating a commercial fishing enterprise on Palmyra by improving real property, buildings, and facilities and commencing commercial fishing in the EEZ. 1/

---

1/ During oral argument counsel for plaintiffs impressed upon the court the extensive time, energy, and economic investments made in preparing Palmyra for what promised to be a lucrative commercial fishing operation. The court reads the allegations of plaintiffs' complaint to embrace the assertion of fact that "[t]his was not a gleam in Mr. [Frank] Sorba's eye. This was millions of dollars of capital invested . . . ." Transcript of Proceedings, Palmyra Pacific Seafoods, L.L.C., et al. v. United States, No. 07-35L, at 22 (Fed. Cl. Oct. 22, 2007).

On January 18, 2001, the Secretary of Interior signed Order No. 3224, designating as a National Wildlife Refuge the tidal lands, submerged lands, and waters out to a twelve-nautical mile distance surrounding Palmyra, and Order No. 3223, designating as a National Wildlife Refuge Kingman Reef and surrounding submerged lands and waters out to a distance of twelve nautical miles. See Am. Compl. filed Apr. 13, 2007, Exs. G, I. On January 24, 2001, Interior published regulations closing Palmyra and Kingman Reef to commercial fishing. 66 Fed. Reg. 7660-02 (Jan. 24, 2001). In 2003 The Nature Conservancy conveyed 416 acres of the emergent land of Palmyra to the United States to be included in the refuge. In September 2006 The Nature Conservancy conveyed an additional 28 acres for inclusion in the refuge.

Plaintiffs PPS, PPE, and PPELP complain that these wildlife refuge designations and accompanying regulations issued by Interior have "directly confiscated, taken, and rendered wholly and completely worthless" plaintiffs' property interests "embodied and reflected in the Palmyra License and the Palmyra Sublicense" (collectively, the "licenses"). Am. Compl. ¶ 37. Specifically, plaintiffs charge that "[t]he prohibition on public access and on commercial fishing resulting from the Palmyra Designation, the Kingman Designation and the related regulations rendered worthless Plaintiffs' property interests in (i) the Palmyra License, (ii) the Palmyra Sublicense, (iii) the improvements Plaintiffs made to the commercial fishing facilities on Palmyra, and (iv) Plaintiffs' commercial fishing enterprise" taking "valuable property interests of the Plaintiffs for a public use without payment of just compensation." Id. ¶¶ 38, 39. Plaintiffs allege both a categorical and regulatory taking. Id. ¶¶ 47, 52.

By order entered on October 4, 2007, 2/ the court directed that the parties to argue the applicability of Omnia Commercial Co. v. United States, 261 U.S. 502 (1923); Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206 (Fed. Cir. 2005); and Huntleigh USA Corp. v. United States, 75 Fed. Cl. 642 (2007). Briefing concluded on October 19, 2007. Argument was held October 22, 2007. Following argument, the court ordered supplemental briefing to allow the parties to address the applicability of new cases discussed by plaintiffs during oral argument. Supplemental briefing was completed on November 9, 2007.

**DISCUSSION**

1. Standard of review

In considering a motion to dismiss filed pursuant to RCFC 12(b)(6), for failure to state a claim upon which relief can be granted, the court's task is not to determine whether

---

2/ The case was transferred to this judge on September 6, 2007.

a plaintiff will ultimately prevail, but "'whether the claimant is entitled to offer evidence to support the claims.'" Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (Fed. Cir. 2007) (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). In Bell Atlantic Corp. v. Twombly, __ U.S. __, 127 S. Ct. 1955 (2007), the United States Supreme Court clarified the standard enunciated in Conley v. Gibson, 355 U.S. 41 (1957), with respect to what a plaintiff must plead to survive a Rule 12(b)(6) motion. 3/ The Supreme Court circumscribed the standard, stating: "'[A]ny statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings.'" McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1356 n.4 (Fed. Cir. 2007) (quoting Bell Atl. Corp., 127 S. Ct. at 1968). Accordingly, the court must assess whether plaintiffs adequately have stated a takings claim and whether plaintiffs can allege any facts that, if proven, would entitle them to the relief sought. See Bell Atl. Corp., 127 S. Ct. at 1968-69; McZeal, 501 F.3d at 1361-62. Although plaintiffs' factual allegations need not be "detailed," they "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp., 127 S. Ct. at 1964-65 (internal citation omitted). The court thus "'accept[s] as true all factual allegations in the complaint, and . . . indulge[s] all reasonable inferences in favor of the non-movant,'" to evaluate whether plaintiffs have stated a claim upon which relief can be granted. Chapman Law Firm, 490 F.3d at 938 (omission in original) (quoting Sommers Oil Co. v. United States, 241 F.3d 1375, 1378 (Fed. Cir. 2001)).

2. Plaintiffs' takings claim

The takings clause of the Fifth Amendment enshrines the ownership of property by providing, in pertinent part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. "The purpose of the Takings Clause is to prevent 'Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" Air Pegasus of D.C., Inc. v. United States, 424 F.3d 1206, 1212 (Fed. Cir. 2005) (quoting Penn Cent. Transp. Co. v. City of New York, 438 U.S. 104, 123 (1978)). The court evaluates whether a takings claim has been stated under a two-part test. First, the court must determine whether plaintiffs have

---

3/ The Conley standard, abrogated by Bell Atlantic, stated "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley, 355 U.S. at 45-46. Bell Atlantic retired the literal interpretation of Conley's "no set of facts" language "as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Bell Atl. Corp., 127 S. Ct. at 1969.

established a property interest for purposes of the Fifth Amendment. Colvin Cattle Co. v. United States, 468 F.3d 803, 806 (Fed. Cir. 2006). The Fifth Amendment does not create or define the scope of a property interest, so the court must look to existing rules and background principles derived from state, federal, or common law to ascertain whether plaintiffs have asserted a cognizable property interest. Id. at 806-07. Second, once a property interest is identified, the court must determine whether the governmental action at issue amounts to a compensable taking of that property. Air Pegasus, 424 F.3d at 1213. The Supreme Court has determined that government action constitutes a compensable taking when a physical invasion or appropriation of private property occurs, see Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419 (1982), or when a government regulation "goes too far" and unduly burdens private property. See Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). This latter class of "regulatory takings" is subdivided further into categorical and non-categorical takings. See Air Pegasus, 424 F.3d at 1213 n.3. 4/

Plaintiffs assert a property interest in "a series of contractual licenses grant[ing] Plaintiffs the right to use Palmyra for commercial fishing and related transport and support operations." Pls.' Br. filed Aug. 10, 2007, at 3 (internal quotation marks omitted). Plaintiffs contend that the licenses are private, exclusive, transferrable contract rights that qualify as property interests protected by the Fifth Amendment. In support of the proposition that contract rights are property interests protected by the Fifth Amendment, plaintiffs rely on Lynch v. United States, 292 U.S. 571, 579 (1934) ("Valid contracts are property, whether the obligor be a private individual, a municipality, a state, or the United States."); United States Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 19 n.16 (1977) ("Contract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid."); and Cienega Gardens v. United States, 331 F.3d 1319, 1329 (Fed. Cir. 2003) ("[T]here is also ample precedent for acknowledging a property interest in contract rights under the Fifth Amendment.").

---

4/ A categorical regulatory taking occurs when a regulation "completely deprive[s] an owner of '*all* economically beneficial us[e]' of her property." Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 538 (2005) (emphasis and second alteration in original) (quoting Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1015 (1992)). Non-categorical regulatory takings are governed by the ad hoc, factual inquiries set forth in Penn Central, which require the court to evaluate the "'economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations.' . . . [And] the 'character of the governmental action' . . . ." Id. at 538-39 (quoting Penn Cent. Transp. Co., 438 U.S. at 124).

Defendant contends that plaintiffs' licenses are not cognizable Fifth Amendment property interests, but, rather, mere licenses. Defendant points to a line of cases beginning with United States v. Fuller, 409 U.S. 488 (1973), where the Supreme Court held, in an eminent domain action, that the Fifth Amendment does not require the Government to compensate for that element of value based on the use of the condemned land in combination with government-issued revocable grazing permits. In Alves v. United States, the United States Court of Appeals for the Federal Circuit ruled that, under the Supreme Court's reasoning in Fuller, government-issued grazing permits and preferences do not constitute compensable property interests at all because they are governmentally created rights appurtenant to the fee. 133 F.3d 1454, 1457 (Fed. Cir. 1998). This reasoning was extended to conclude that government-issued fishing licenses did not constitute cognizable property interests under the Fifth Amendment in Conti v. United States, 291 F.3d 1334, 1341-42 (Fed. Cir. 2002) (holding government-issued swordfishing permit did not constitute compensable property interest, but was "revocable license," because plaintiff could not assign, sell, or transfer permit, permit did not confer exclusive right to fish, and Government retained right to revoke, suspend or modify permit at any time), and American Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1374 (Fed. Cir. 2004) (holding plaintiff did not have Fifth Amendment property interest in government-issued fishery permit that was not transferrable, exclusive, or irrevocable). Defendant asserts that this line of cases shows that "Plaintiffs' license does not convey the essential 'stick in the bundle' that would establish a property interest." Def.'s Br. filed July 13, 2007, at 13 (quoting Conti, 291 F.3d at 1340).

Plaintiffs distinguish the cases cited by defendant as dealing with government-granted, non-transferrable, non-exclusive permits and licenses that do not control the status of plaintiffs' private licenses as a cognizable property interest. Plaintiffs counter with the decisions of the United States Court of Claims in Jackson v. United States, 103 F. Supp. 1019 (Ct. Cl. 1952), and Todd v. United States, 292 F.2d 841 (Ct. Cl. 1961), holding that a plaintiff's transferrable, government-issued fishing license was a "sort of property right" that the Government was liable for taking when the military prohibited plaintiff from entering the grounds upon which plaintiff had been licensed to fish. Jackson, 103 F. Supp. at 1020; see also Todd, 292 F.2d at 845 (agreeing, by way of dictum, that Government is "equitably liable" for taking of fishing permit under substantially same facts as those in Jackson). But see Conti, 291 F.3d at 1342 n.7 (noting that "both Todd and Jackson were decided before Fuller. We do not need to address here whether they remain viable after Fuller.").

Despite plaintiffs' disagreement with the applicability of American Pelagic, Conti, Alves, and Fuller, both plaintiffs and defendant appear to agree that whether plaintiffs' licenses constitute a compensable property interest at all turns on whether the private licenses were transferrable, exclusive, and irrevocable. See Pls.' Br. filed Aug. 10, 2007,

at 6-9; Def.'s Br. filed Sept. 5, 2007, at 2-7. This question remains arguable and potentially the subject of a factual dispute; however, the materiality of that dispute – and the issue before the court – turns on whether plaintiffs possessed a legally protected property interest that actually was the subject of the alleged taking. Air Pegasus, 424 F.3d at 1215 ("As an initial matter, a claimant seeking compensation from the government for an alleged taking of private property must, at a minimum, assert that *its* property interest was actually taken by the government action."). 5/

The case at bar is analogous to the binding precedent in Colvin Cattle, 468 F.3d 803, where plaintiff claimed that the Government had taken its private property interests in a ranch and water rights after the Government cancelled plaintiff's term grazing permit in an adjacent allotment. Relying on the Supreme Court decision in Fuller, 409 U.S. at 493, the Federal Circuit held that no taking had occurred. The court determined: "That the ranch may have lost value by virtue of losing the grazing lease is of no moment because such loss in value has not occurred by virtue of governmental restrictions on a constitutionally cognizable property interest." Colvin Cattle, 468 F.3d at 808. Similarly, here, plaintiffs posit that the Government's closure of the waters surrounding Palmyra to commercial fishing has rendered worthless plaintiffs' property interest in the private licenses that permitted plaintiffs to use the lands of Palmyra to establish a commercial fishing operation. Plaintiffs, however, expressly disavow any claim of a property interest in the "tidal lands, submerged lands, or surrounding waters" of Palmyra. Pls.' Br. filed Aug. 10, 2007, at 12 ("Indeed, the defendant correctly notes that the interests in Palmyra of the Fullard-Leo family (the ultimate source of Plaintiffs' license rights) extended only to 'emergent land.' Accordingly, the Fullard-Leo's lacked authority to grant any license in the tidal lands, submerged lands, or surrounding waters, and the government could not have taken any tidal lands, submerged lands, or surrounding waters."). As plaintiffs admit, the governmental restrictions designating the refuge and closing it off to commercial fishing were imposed upon the "tidal lands, submerged lands, and waters" of Palmyra – the interests to which plaintiffs disavow any claim. Id. ("[W]hen the government designated the Palmyra National Wildlife Refuge,

---

5/ Defendant also argues that plaintiffs have failed to state a claim upon which relief can be granted because "even if a taking occurred as Plaintiffs allege, such a taking would have triggered section 7.01 [a termination upon taking of Property provision] of the license, and the license would have 'at once ceased and terminated.'" Def.'s Br. filed Sept. 5, 2007, at 13 (quoting Am. Compl. Ex. A at 33-34). Plaintiffs rejoin that "defendant's assertion is not correct; correspondence exchanged in 2004 in the ordinary course of business between Plaintiffs and their licensor establishes that neither party believed the license had terminated in 2001." Pls.' Br. filed Sept. 25, 2007, at 2. Although this disagreement manifests a factual dispute between the parties, the dispute is immaterial to resolution of the dispositive issue.

'[t]he refuge consisted of tidal lands, submerged lands, and waters' – *not* emergent land . . . ." (second alteration in original)). Therefore, as in Colvin Cattle, that plaintiffs' property interest in the licenses has lost value by virtue of the loss of commercial fishing access to the waters surrounding Palmyra is of no moment, because such loss in value was not occasioned by governmental restrictions on a constitutionally cognizable property interest possessed by plaintiffs. No taking of plaintiffs' property interest in their licenses occurred upon the Government's declaration of the Palmyra National Wildlife Refuge and subsequent closure of the refuge to commercial fishing.

What plaintiffs complain of amounts, at most, to a frustration of purpose, rather than a taking of plaintiffs' commercial fishing licenses. A similar claim was rejected by the Supreme Court in Omnia Commercial Co. v. United States, 261 U.S. 502 (1923). In Omnia plaintiff possessed a contractual right to purchase a large quantity of steel from the Allegheny Steel Company at a low fixed price. Prior to any deliveries, the Government requisitioned Allegheny Steel Company's entire production of steel plate for the year 1918 and directed the company not to fulfill its contract with plaintiff. Plaintiff sued in the Court of Claims claiming that government actions had effected a taking for public use of its property in the contract. Acknowledging that plaintiff had a property interest in its contract, id. at 508 ("The contract in question was property within the meaning of the Fifth Amendment . . . ."), the Supreme Court nonetheless held that plaintiff's loss was merely "consequential" and one for which takings law afforded no remedy. Id. at 510 ("If, under any power, a contract or other property is *taken* for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable."). The Court characterized plaintiff's claim as "confound[ing] the contract with its subject-matter," and pointed out that the Government neither acquired the contract nor took away the right to enforce it. Id. at 510-11, 513 ("In the present case the effect of the requisition was to bring the contract to an end, not to keep it alive for the use of the government."). As a consequence, the Supreme Court rejected plaintiff's takings claim, holding that "[f]rustration and appropriation are essentially different things." Id. at 513.

The Federal Circuit in Air Pegasus applied the Omnia precedent to a claim brought by a heliport operator following implementation of Federal Aviation Administration (the "FAA") post-9/11 regulations that precluded use of plaintiff's leased property as a heliport, the only use permitted under the subject lease. The Federal Circuit determined that plaintiff's complaint sought compensation for a "derivative injury." Air Pegasus, 424 F.3d at 1215 (noting that regulations prohibited operation of helicopters, of which plaintiff owned none, so plaintiff's "economic injury is not the result of the government taking [plaintiff's] property, but is the more attenuated result of the government's purported taking of other people's property"). Applying Omnia, the Federal Circuit agreed that plaintiff possessed a property interest in its leasehold, but explained that the FAA's restrictions did not regulate

plaintiff's operations under its lease. Id. at 1216. Instead, the court held that the actions of the FAA "frustrated [plaintiff's] business expectations . . . . Therefore, like the appellant in Omnia, [plaintiff], while no doubt injured by reason of the government's actions, has not alleged a taking of private property under the Fifth Amendment." Id.

As in Omnia and Air Pegasus, plaintiffs' complaint conflates the licenses with their subject matter. The licenses permit plaintiffs to use the emergent land of Palmyra for the purpose of establishing a commercial fishing operation. The Government's closure of the waters surrounding Palmyra to commercial fishing frustrated the purpose of the licenses, but did not appropriate a contractual right to commercial fishing granted thereby, as such a right could not have been granted. The Government is not liable to plaintiffs for a taking because the government actions at issue did not address plaintiffs or their licensors or regulate plaintiffs' operations under their licenses. The designation of the Palmyra National Wildlife Refuge and subsequent closure of the refuge to commercial fishing neither appropriated plaintiffs' contract rights for public use nor removed plaintiffs' right to enforce their contractual licenses or to seek a contractual remedy with their licensors.

3. Applicability of Cienega Gardens v. United States

Plaintiffs rely heavily on Cienega Gardens, 331 F.3d 1319, 6/ to refute the argument that the governmental action represents a frustration of purpose and does not constitute a taking. In Cienega Gardens the Federal Circuit held that the Government effected a taking of plaintiffs' private contractual pre-payment rights when Congress legislatively abrogated those rights. In the circumstances of the case, the Federal Circuit deemed application of the principles from Omnia "inapt." Id. at 1335. The court held that "[t]he proposition in Omnia about consequential loss or injury refers to legislation targeted at some public benefit, which incidentally affects contract rights, not, as in this case, legislation aimed at the contract rights themselves in order to nullify them." Id. The court remarked:

> The enactment of [the legislation eliminating pre-payment rights] directly and intentionally abrogated the contracts. The effect on the contracts is, therefore, not merely consequential. Where Congress' actions have the effect of "keep[ing] [the contract] alive for the use of the government" rather than "bring[ing] the contract to an end," a court should conclude that there *has* been a taking. Cf. Omnia, 261 U.S. at 513, 43 S. Ct. 437.

---

6/ Cienega Gardens v. United States, 503 F.3d 1266, 1275 (Fed. Cir. 2007), refers to the decision rendered in Cienega Gardens, 331 F.3d 1318, as "*Cienega VIII*" and notes that the decision only resolved takings liability as to the four model plaintiffs in that case.

Id. (alterations in original).

Plaintiffs have submitted several documents that, they argue, "establish that the government's actions in establishing the Palmyra National Wildlife Refuge and 'clos[ing] the refuge to commercial fishing' were 'aimed [directly] at [plaintiffs'] contract rights themselves in order to nullify them.'" Pls.' Br. filed Oct. 18, 2007, at 2 (alterations in original) (internal footnotes and citations omitted). The first document is a July 17, 2000 e-mail from Justin Johnson to Tim Elliott and Joseph McDermott at Interior. The e-mail discusses a collaboration between the Fish and Wildlife Service (the "FWS") and a private entity, The Nature Conservancy, in creating a nature preserve at Palmyra. The e-mail discusses plaintiffs' fishing permit and warns that plaintiff Frank Sorba, "is heading to Palmyra now."

A series of internal government e-mails begins with a July 25, 2000 e-mail from United States Coast Guard Lieutenant Mark Murakami to Mr. McDermott, forwarding a report compiled by a Coast Guard boarding officer who had visited Palmyra in early July 2000. The e-mail discusses The Nature Conservancy's planned development of an "eco-tourism camp," which had already hosted twelve "Washington politicians and prominent Fortune 500 business owners" for five days at a price of $5,000.00 each. The report discusses plaintiffs' licenses and their intended development of commercial fishing operations. The final part of the report sets forth "major concerns by Mr. [Steve] Barclay," the on-scene manager for The Nature Conservancy and previous employee of the FWS: "Mr. Barclay feels eco-tourism and nature preservative agenda will conflict with [plaintiffs'] fishing fleet/industry. Major concerns of pollution and impact to lagoon and island environment." The next in the series of e-mails regarding the boarding officer's report, also transmitted on July 25, 2000, are between Mr. McDermott and Sandra King at Interior. Ms. King, upon being forwarded the report writes: "Jooeeeee!!! What is this???? Who do we need to beat up?? :-)" Mr. McDermott responds, "You are probably upset by Section C [of the boarding officer's report] and Frank Sorba's plans. So are we . . . ." Plaintiffs proffer that they "have uncovered additional publicly available documents showing that the government was (and is) working 'cooperatively' in a 'partnership' with [The Nature Conservancy]." Pls.' Br. filed Nov. 9, 2007, at 1.

Plaintiffs characterize these documents as revealing "an intent to 'beat up' on plaintiffs to favor a competing commercial enterprise," and argue that, at a minimum, they present a genuine dispute of fact on the issue of whether the Government's actions were "'aimed at the contract rights themselves in order to nullify them.'" Id. (quoting Cienega Gardens, 331 F.3d at 1335). The court is troubled by the inappropriate relationship that these documents portray. But, despite the inappropriateness of the Government's apparent

motivation that these documents disclose, plaintiffs misapprehend the import of Cienega Gardens to this case.

Plaintiffs argue that the motivations of the Government control the Cienega Gardens inquiry into whether government actions targeted plaintiffs' contract rights in order to nullify them, thus warranting a departure from the rule of Omnia and Air Pegasus. The language employed by the Federal Circuit in Cienega Gardens, however, belies the construction that plaintiffs give it. The legislation involved in Cienega Gardens was "aimed at the contract rights themselves in order to nullify them," not only in motivation but in structure and form. Cienega Gardens, 331 F.3d at 1335. This distinction is made apparent by contrasting the facts presented in Cienega Gardens and those involved in Omnia: "Moreover, in this case it was the contract rights, not as in Omnia, the subject matter of the contract that was taken." Cienega Gardens, 331 F.3d at 1335 n.29 (citation omitted). The statute in Cienega Gardens directly acted upon and abrogated the contract rights themselves, but the same characterization cannot be ascribed to the government actions in Omnia and in this case, which regulated only the subject matter of the respective contracts – the steel production and the commercial fishing activities.

Other language from the Federal Circuit's opinion in Cienega Gardens is conclusive: "Where Congress' actions have the effect of 'keep[ing] [the contract] alive for the use of the government' rather than 'bring[ing] the contract to an end, a court should conclude that there *has* been a taking." Id. at 1335 (quoting Omnia, 261 U.S. at 513). Plainly, this distinction between the facts of Cienega Gardens and those of Omnia does not hold true for plaintiffs. Plaintiffs have not, and cannot, allege that the Government has appropriated the benefits of plaintiffs' licenses for itself or has sought to step into the shoes of plaintiffs as licensees to establish Interior's own commercial fishing operation. Plaintiffs' licenses have been "[brought] to an end," not kept alive for the benefit of the Government in the same manner as the contract at issue in Omnia: "[T]he performance of the contract was rendered impossible. It was not appropriated, but ended." Omnia, 261 U.S. at 511, 513. The doctrine of frustration is the correct theory under which plaintiffs complain. "Frustration and appropriation are essentially different things." Id. at 513.

4. Plaintiffs' arguments raised in supplemental briefing

Plaintiffs' recent efforts to distinguish Omnia, and Air Pegasus 7/ are unpersuasive. They argue that Omnia, and the line of cases that apply its principles, "all involved the government's exercise of its broad power to protect national security and to implement foreign policy." Pls.' Br. filed Nov. 9, 2007, at 2. Based on the Federal Circuit's decision in Paradissiotis v. United States, 304 F.3d 1271 (Fed. Cir. 2002), plaintiffs take the position that "such decisions are *sui generis* and do not establish generally applicable takings law." Pls.' Br. filed Nov. 9, 2007, at 2. The Federal Circuit announced in Paradissiotis, explicating Omnia, that "valid regulatory measures taken to serve substantial national security interests may adversely affect individual contract-based interests and expectations, but those effects have not been recognized as compensable takings for Fifth Amendment purposes." Paradissiotis, 304 F.3d at 1275. Plaintiffs do not succeed in their attempt to transmute this descriptive gloss into a general pronouncement restricting application of the principles enunciated in Omnia. The Supreme Court's sound reasoning in Omnia itself was not dependent upon the national security concerns characterizing the Government's action; in fact, the Court declared that "[t]he character of the power exercised is not material." Omnia, 261 U.S. at 510. As Omnia recognized, this issue cuts both ways: "If, *under any power*, a contract or other property is *taken* for public use, the government is liable; but, if injured or destroyed by lawful action, without a taking, the government is not liable." Id. (first emphasis added).

Contrary to the implications of plaintiffs' argument, exercise of governmental power pursuant to national security concerns or those of foreign policy does not immunize those governmental actions from judicial review. The Government is bound by the protections

---

7/ Plaintiffs distinguish Air Pegasus on the ground that the plaintiff in that case did not own the property that was taken. Pls.' Br. filed Nov. 9, 2007, at 3-4 (citing Air Pegasus, 424 F.3d at 1215 ("Air Pegasus's economic injury is not the result of the government taking Air Pegasus's property, but is the more attenuated result of the government's purported taking of other people's property.")). In contrast to Air Pegasus, plaintiffs assert that they own the property underlying their claim, because "the contract was the property, and plaintiffs' rights had fully vested prior to the taking." Id. at 4. Plaintiffs continue to ignore the distinction between the subject of the contract and the contract itself. The government action that plaintiffs allege took their licenses in the case at bar was the closing of the refuge to commercial fishing – the subject of the licenses, not a right granted therein. See supra pp. 7-8. Plaintiffs do not allege that the government action operated to acquire the licenses for the benefit of the Government or took over for the Government plaintiffs' right to enforce the licenses. See Omnia, 261 U.S. at 510-11; discussion supra p. 11.

afforded in the Takings Clause of the Fifth Amendment, both when the government action implicates the exercise of power over national security or foreign policy and when the government action represents another exercise of sovereign power. Omnia establishes that whether a taking has occurred in these circumstances depends, not on the character of the governmental power exercised, but on whether the governmental action actually regulates an individual's cognizable property right so as to appropriate it for public use without the payment of just compensation. See Colvin Cattle, 468 F.3d at 808 (holding that loss in value to property interest is not taking when such loss in value was not result of regulations upon that property interest, but, instead, over interest in which plaintiff could claim no property stake).

Even if the court were to proceed on the assumption that plaintiffs' licenses constitute property interests, plaintiffs have failed to allege that the Government's designation of the Palmyra National Wildlife Refuge and closure of the refuge to commercial fishing directly regulated operations under those licenses. The designation and closure of the refuge frustrated plaintiffs' business expectations pursuant to their licenses and, no doubt, operated to the severe financial detriment of plaintiffs. Yet, plaintiffs have not asserted a cognizable property interest subject to the government action sufficient to support a takings claim under the Fifth Amendment. Plaintiffs have not shown, and cannot show, any facts that, accepted as true, entitle them to the relief sought, and therefore no claim is stated upon which relief can be granted.

**CONCLUSION**

Accordingly, based on the foregoing, defendant's motion to dismiss is granted, and the Clerk of the Court shall enter judgment pursuant to RCFC 12(b)(6) dismissing the complaint.

**IT IS SO ORDERED.**

No costs.

s/ Christine O.C. Miller

**Christine Odell Cook Miller**
Judge